And we'll move on to our next case. It's Jennifer Akridge v. Alfa Mutual Insurance Company. And Kyle David Sawyer and Julian Linwood McPhillips Jr. should be here for Akridge. Yes sir. Yes sir. And Thomas Davis for Alfa Mutual Insurance Company. Good morning. Good morning. And Mr. Sawyer and Mr. McPhillips, who's going to present the argument on behalf of Akridge? Your Honor, Mr. Sawyer is going to go first and I'm going to do the rebuttal. All right. Mr. Sawyer, you may proceed. Thank you, Your Honors. My name is David Sawyer and I represent the appellant, Miss Jennifer Akridge. I represent her and her appeal, and I think we've raised two issues, primarily the summary judgment that was entered by the district judge and then the discovery issues that were issued by the court that limited our discovery in the process. As to the summary judgment in a disability case, there are two ways to present or to survive a summary judgment presented by an employer. And one is to present evidence of a comparator under the doctrine that normally goes back and forth between the plaintiffs and the defendant. And then also to present a second method is by circumstantial evidence. And I think in this case, the plaintiff presented substantial evidence in both scenarios. Initially with the comparator aspect, first of all, Alpha presented no document at all during the discovery of this case or to the court of any way that her job had ever been automated or was going to be automated. She was given no notice as well. In addition, they claimed that there was reorganization within the underwriting department where she worked. Alpha, again, has produced and did not produce to the court any document showing how any jobs in the underwriting department would be reorganized. But we did present a comparator. Ms. Aperidge had a job in the auto division of underwriting and Ms. McCaleb had a similar job, very similar job, in underwriting for property. They both addressed agents on a one-by-one basis trying to reduce risk. They traveled throughout the three states, Alabama, Georgia, and Mississippi to meet with these agents. There were jobs that could not be automated and Ms. McCaleb's jobs were not automated. In fact, the only issue in this case was that there was only one employee that was chosen to be dismissed and that was Ms. Aperidge. The company seems to say that the comparator, her job, her division was not as automated or consolidated, and also that she had special project responsibilities that differed from the plaintiff. What's your response to those suggested differences? Again, those are suggested differences. Alpha presented not a single document supporting their argument. We asked and deposed the alleged decision-makers that they produced, and that's what they stated, but they could produce no document that actually supported that argument. I think when you look at... Were the decision-makers the same for both employees? I don't think they had the same supervisors, but I think they had the same decision-makers, and those were the HR directors, Scott Forrest, and even the president. Those decisions regarding dismissal or reorganization came from the top, not from... Wait a minute. There's evidence in the record that Scott Forrest was a decision-maker? Yes. I think each of the deponents, each of the individuals we deposed, made specific reference to the fact that any decision to eliminate a job had to come from the top on down, starting with the president and then Scott Forrest, the HR director. I thought Mr. Forrest signed an affidavit indicating that he was not a decision-maker. He signed that document, but we were not able to question him about his lack of knowledge. However, the very document that they presented to Ms. Akeridge at the time of her termination was to be returned directly to Mr. Forrest. He was involved in this case from the get-go, and I think Ms. Akeridge's supervisor, Mr. Plaster, even indicated that the discussion to eliminate her job, although he was not privy to this discussion, had been going on for months. Do we know how much money they spent on her medical bills over the period of time, the total? Is that in the record? No, sir, that is not in the record. Again, there are documents showing that they produced, I believe, showing what they claimed they paid as a self-insured company, but as to that issue— Well, that's what I'm interested in, what they paid. Do we know how much they paid? I'm not certain. I think it could have been up to $10,000 a month, but it was, as the ADA says, regardless of how much— I'm throwing you a softball. I want to know how much money was spent by the company due to her medical situation. Does the record tell us that? Ms. Akeridge testified that by affidavit. I know she testified that. Does the record tell us how much altogether? It was $10,000 a month, roughly. Yeah, but for what period of time? How do we add it up? I think from the time the doctor prescribed, it may have started up to 10 years prior to this. The reason I asked if it was an enormous amount of money, then the vice president you wanted to depose probably knew about it. It may have come into the calculus of what they're going to do. That's why I asked the question, but you can't answer it. I know what she said in the affidavit, but that doesn't tell me totals. We don't have totals, but we have documents showing that Mr. Scott Forrest was head of their self-insured plan, and by that information, he would have had specific knowledge of what— How many employees does the company have? They have at their home office close to 1,000. What's the overall number? Pardon? What's the overall number? For the whole company? Yeah. I don't have that information. I know that at their home company in Montgomery, at that office alone, they employed over 1,000 employees. And the year Mr. Akridge was terminated, they hired an additional 100. Is Mr. Forrest the HR director for those 1,000 people or for those 1,000 people plus other offices? 1,000 plus. He's the HR director for the entire company. Do you have any idea how many total employees the company has? I'm just trying to get a sense of the scale of the enterprise that he's overseeing. I think there was a document that was produced that we provided that showed that they had, I think, close to 2,500 employees the year she was dismissed. Okay. Thank you. And all of these employees were insured by the same health insurance policy and should have been provided the same health insurance benefits. They didn't single out one benefit based on how much it costs. If it was being provided to someone with diabetes or someone with a heart condition, they could not single out, and the ADA says that you cannot single out a specific element based on the cost of a prescription drug or based on the cost of a surgery or the continued cost of diabetes. And Ms. Akridge had been provided this accommodation for over 20 years. I think she was diagnosed three years after she started work there. She had been working there for 27 years when she was notified one afternoon at 4 p.m. that they didn't need her anymore. The office. So both you and the company seem to assume that the mixed motives analysis applies under the ADA. Is that a fair assumption? I think the mixed motive issue cannot be addressed or used in ADA, but I think the circumstantial evidence can be. And I think we've presented substantial circumstantial evidence to make the decision. And, again, the fact that we were not even allowed to depose Mr. Forrest or any other witnesses about who made the actual decision, and the fact, again, that there are no documents supporting any automation are the basis for her termination. It's just all statements made by people who were supposed to make those statements. When we took Susie White's deposition as designated by Alpha to answer questions about this, she stated that she met with Scott Forrest for an hour or more in preparation for a deposition. So she could not answer our questions. So what I'm getting at though is the legal standard that we need to apply here and what I know that, and I don't think we have a Supreme court case out whether mixed motives or but for causation applies under the ADA. But there are cases for similarly worded statutes that do require, but for causation, rather than a mixed motive analysis. Have you, have you looked at that question at all? I looked at the mixed motive aspect and I also looked very seriously at your recent opinion in Lewis feast, the city in 2019, where it addressed what happens if you can't present a comparator or even if you can, you also have an option to address circumstantial evidence and it goes back to way that a plaintiff can present any evidence that demonstrates any other things that are suspicious, ambiguous bits and pieces. As long as it shows or raises a reasonable inference that that discrimination had occurred. And there's a case, I think that a district judge in the Northern district of Alabama denied summary judgment simply because the company could not produce a single document supporting the basis of what they did when they terminated an employee. And that's exactly the case here. There are no documents. There's only the deposition testimony of those chosen by alpha to answer our questions. So are there, are you saying there are no documents describing the decision to terminate your client? Correct. Not a single document other than the one that said, please sign this so that you won't sue us in the future and send it back to Scott Forrest. And it was given her the day that she was asked to leave. Is there anything in the record that lets us know about why they terminated her and put her out of the building as they did? Is that a normal practice? No, it is not the normal practice. What does the record tell us about how, what their practice was? There's testimony from the, I think from Koshat and Chancey and even maybe Susie White that said that if there is a job normally eliminated or no longer needed that they find a job also at the home office. I'm talking about the circumstances of departure. As I understand it, she met with two people about four o'clock in the afternoon. Correct. Okay. And they said you're fired or you're terminated. Correct. And then they went to her office, as I understand it, and she gathered their belongings and they ushered her out of the building. Somebody ushered her out of the building. Did that happen that way? That's what happened. And they didn't even let her get to the personal belongings. My point is, what is in the record about how they normally handled the terminations of that sort? This was not a firing. This was a termination. It's whether or not they basically clean out the desk and usher her out of the building right now. Well, Mr. Plaster, her supervisor stated that in his number of years of employment there, he had never seen that ever happen during his entire employment, that anyone was actually terminated. What evidence is there in the record that explains why they did it that way? Well, they didn't give her a, an evaluation for the year 2016. What is in the record that explains the circumstances under which they got her out of the office, out of the building? Why, for example, they didn't give her a couple of days notice or let her go out on her own. You understand me? I understand. I don't know if there's testimony as to how they had done that in the past, but there's record in that they've never done that to anybody before. Those two people were deposed, were they not? They were. What would they say? They said that they had received instruction. To do it that way. To terminate her that day. I understand, but I'm talking about to terminate her physically like they did. I think so. And for who gave the instructions, did they say? They said it all came from the top on down, which would have been from HR. And I think Chancey said it came from HR. Did they give a name? No. And did they give a rationale? They gave a name when we asked who those persons were or would have been. And they said, Scott Forrest. They didn't, they didn't give us any rationale except for, they said cost and, and benefits. No, but did they, did they give a rationale for. Making her leave the office immediately rather than. Kind of go back to her desk, say goodbye to her friends at the office, that kind of thing. When. I took her to her office and said, we don't need you anymore and asked her to sign the release document. When she refused to sign that document, that's when they made their decision that she was leaving immediately and they would send her her personal belongings in a box and. Okay. They didn't give her any other explanation. Why did they have to go to her office in the first place? I think that they'd get her purse and a photograph that was on her desk. And I guess they wanted to explain or ask her to sign this release. Well, she could have signed it, but where they were having the meeting, the meeting was in her office. Okay. All right. Thank you, Mr. Sawyer and Mr. McPhillips has preserved some time for rebuttal. We're here from Mr. Davis on behalf of alpha. You're going to have to unmute your microphone. We can't hear you, Mr. Davis. You got to click the mute button. I'm unmuted. Thank you. And may I please. Can everyone hear me now? Yes. Okay. I'm here for alpha insurance, mutual insurance company. This is an individual discrimination case related to the elimination of a job. One department. Alpha is a multi-line insurance company and they eliminated her job and automobile underwriting in 2016, because her duties were automated because they got a new computer system and the past insurance agents across the state would call her and ask her underwriting questions. This was automated and agents could access that information through the computer. So they didn't need her. She was not replaced. This was part of a broader restructuring and this information is in the record that the underwriting department decreased headcount by 12 and a half percent starting in 2015. Two individuals were let go in 2015, five in 2016, including the plaintiff plaintiff supervisor in 2017. The individuals involved in this decision were three people, Bob plaster, Beth Chancy, and Tommy Koshak. That's the leadership. They made the decision. They offer her a severance that under the older worker benefit protection act gave her 20 up to 21 days to review. That's undisputed. She did not apply for an open, open job. Mr. Davis, the types of procedures that are normally handled by human resources, these procedures presenting her with the, you know, with documents to sign and things of that nature and advising her that her job has been automated. Doesn't the human resources normally communicate with the employee about these decisions? But to the record, your honor is that Tommy Koshak and the leadership team of the underwriting department consulted with Susie white, who was deposed to go over those issues. And the practice was for the direct supervisor here, Mr. Plaster and Mr. Koshak sit down with her and explain what happened. And that's the normal practice. It's not the normal practice. There's no evidence of the record that the normal practice is for HR to handle this. I guess my concern with regard to Mr. Frost is he signed an affidavit. What's the, what's the harm in permitting acreage to take his deposition? I mean, I understand that the, these are matters that are normally left within the sound discretion of the district judge, but it doesn't appear like this would be oppressive or cumulative or burdensome. I don't understand what the harm is to permit them just to take his deposition. Well, the there, the first attempt to take a deposition was coordinated. They also wanted to depose the CEO of the company, but the court's reasoning was the first order of the court denying the request was let's depose the decision makers. And then consider what evidence you have that Mr. Forrest was involved. And the affidavit that Miss, the plaintiff here filed was not even based on her personal knowledge. Well, how would she know? Excuse me? How would you, Alpha had all of the information, all of it for her termination, all of it. So there's no way in the world she could make a representation about what information Alpha had because Alpha had all of it. If we were under a McDonald Douglas analysis, for example, in a title seven case, Alpha would have to cough everything up showing reason. An affidavit was filed and he said, I didn't have anything to do with it, but that doesn't impress me at all. That's nothing but a lawyer talk. Well, the lawyer says to the judge, well, the vice president didn't have a role. Thank you. Motion denied. Well, your honor, the lower court held multiple hearings on this. And the first order, the district judge or the magistrate acting as a district court judge said, let's see what evidence you have or what knowledge you have. And we produced thousands of pages and I, and she came up with a legally insufficient affidavit that showed no personal knowledge. Well, he was the head of HR, but she did her testimony. Your honor is her only testimony. And I asked her this question, why should you depose Scott Forrest or what, what does Scott Forrest know? And all she said was everything comes through HR. He's ultimately responsible. That doesn't impress me counsel at all because she can't be expected to know what's in his mind. Correct. That that's why the district court looked at it and your honor, you, this, this court and pale and the title bond addressed a similar issue where the court found that the district judge exercise his discretion appropriately where the sought to be witnessed had no firsthand knowledge. How do we know that? Because the court gave the plaintiff nine opportunities. The plaintiff doesn't know what he had, what he knows. You understand my point? Right. Because the honor apply, excuse me, your honor, the district court applied the, the standards in rule 26, which said you've deposed, I am giving you the opportunity to depose the three supervisory witnesses plus two 30 B six witnesses. And after taking all those depositions, he weighed and he weighed the information and looked at the information that the plaintiff provided. And there was just simply no evidence in the record, nothing offered by the plaintiff to suggest any involvement whatsoever by Mr. Forrest. It was, if she thought Mr. Forrest had information, she would know that from day one. No, she wouldn't. He's a head of HR. My understanding is HR is involved in the, in the decision. There's nothing in the record that suggests that your honor. Oh, in other words, HR had nothing to do. The record shows nothing, whatever to do with the termination. No, your honor are downsizing the office. What the evidence is is that the human resource representative who was the corporate representative on two occasions testified that she was the individual within HR, the employee relations person who provided that input and advice that it was not Scott Forrest. And it was no one else. That's what the evidence was before the court. And when you compare that, your honor, Mr. Davis, that Scott Forrest have access to, um, this acreage is healthcare information. No, he was not aware that the company was spending approximately 10 to $11,000 a month for healthcare. No, no, we have that in the record. Yes. The evidence was with respect to healthcare costs that that information can be accessed at access by one person in HR, but it's never been access to their knowledge. We produce that in camera to the court. And who would that person have been in HR? It would have been a benefits person within HR. That was the testimony. And as far as Mr. Forrest supervise that person, that not directly, but indirectly that person's house within the HR department. And there was a third, your honor, there was a 30 B six witness who provided testimony on these particular issues as ordered by the court. And.  I don't know the answer to that question. But didn't that at one point, didn't the court have a problem with the fact that that witness said that she didn't know the answers to a lot of the questions that were posed to her? No. The court. When it ordered alpha to produce. It's. Blue. Let me back up blue cross manages alphas health insurance program. It's self-funded, but blue cross manages the program. And Ms. White was prepared and answered questions. It was the plaintiff who objected to it, but the court never had any problems with Ms. White's testimony because it wasn't relevant to the issue here of did. It should be noted. The plaintiff here was diagnosed with MS in 1993. Or 1993 until 2016. There's no evidence, no complaint of discrimination. She never. Voiced a concern. No one ever said anything negative to her. There are 12 and a half percent fewer people in the underwriting department. There is no evidence that anyone else's job was automated. Like hers. There were five other people. Whose jobs were eliminated. There were two retirements, plaintiff's own supervisor retired the following year and was not replaced. Mr. Davis. Could Scott Forrest be called? If this, if we reverse the summary judgment in this case, went to trial without his deposition taken, could he be called as an adverse witness at the trial? That was an argument that the district court addressed. That. The, as we would. The court would have to address these same issues again. Does that witness have any personal knowledge as the court did and if so,  I mean, if there's no evidence in the record, we don't know that without his deposition haven't been taken, even if he wasn't a decision maker. I mean, isn't it possible that he might've overheard a conversation. Among decision makers that might lead to. Relevant evidence that would be admissible at the trial. I mean, the corporate. Based on the record today. That evidence doesn't exist. If that evidence did exist, the plaintiff could have testified to that in the affidavit that was based on her personal knowledge, your honor, the affidavit that plaintiff filed on two occasions here was not even based on her personal knowledge. So conceivably, yes. Practically likely they would have an in-camera hearing and conclude. He's not a relevant witness. The company has about 2,500 employees overall. Yes, your honor. That's exactly the number. Where are they scattered? They're primarily. They're primarily in Alabama. They maintain a employee workforce in Alabama and independent agents. In Mississippi and Georgia. And then they have a. Another company in Tennessee. The independent agents in the 2,500. No, I'm not. The 2,500 are true employees. But they operate in multiple States, Tennessee, Alabama, Georgia, and Mississippi. Primarily. And then they have an independent agent. In Alabama. Can you tell us what's in the record about the ordinary. Practices when someone is terminated in terms of whether they're allowed to. Stay for some period of time or whether they're let out the way. The miss. Miss average was. Well, let me just, with all due respect, she was not. Thrown out the door. She was. How they handled miss acreage is how they handle all terminations, but there's nothing in the record to suggest either way. That was not subject to any deposition questions. And what about, I know that she, I know the record shows that she didn't apply for any jobs. Doesn't she have testimony that she kind of generally reached out and were told, was told that there were no available jobs that she could apply for. She was told, and this is correct. There were no available open jobs in underwriting. There were other jobs within the company that's on a portal that she could have applied for. And she never did. And there were, and that's what she was told. And she reached out to the executive vice president of marketing and testimony. My recollection is that he said, you could apply for a job. Anyone can apply for a job internal or external. So two minute warning. But your honor, you judge grant, you had a question about the mixed motive analysis. We maintain that this is as the court recently addressed in the Williams V housing authority of Savannah. They kind of went, you went through a good analysis of the different standards here. There's no direct either under the mix, under the mixed motive or looking at direct evidence. The only evidence here that plane is pointing to suggest there was any improper motive. And I submit, there is none is the plan that the decision-makers were aware that when you terminate someone, you save their salary compensation costs, plus benefit costs. That to me doesn't trigger a mixed motive analysis. This is a burden shifting analysis. There's absolutely absolutely no comparator evidence. The five individuals that she points to are still employed by alpha in different jobs, different supervisors. Mr. Sawyer, miss mentioned, miss McCallum again, that affidavit, which the court struck, but still considered was not based on her personal knowledge. And it showed miss McCallum worked in a different department, different supervisors as judge grant, you acknowledge he did at different duties. He did different things and there's no evidence otherwise. So under any theory, whether it's the burden shifting analysis or a mixed motive analysis, there's just nothing in the record to suggest that the reason given by alpha for terminating plans, employment was discriminatory. I want to make sure that I understand what you said on one thing earlier. Are you saying that electronic evidence shows that although one person had access to medical costs for employees, no one has ever actually accessed those numbers. That's my understanding. Correct. Nowhere that is in the record. I believe Susie and Susie White's testimony. The second deposition is part of the summary judgment opinion. Now, since your time has expired. Thank you. We suggest the district lower court's opinion should be affirmed for the reasons stated in our papers. Thank you. Thank you, Mr. Davis. Mr. McPhillips. You're going to have to unmute unmute your microphone. I can't hear you. Can you hear me? Got me, David. Can you hear me now? Yes. Okay. Thank you. I'm Julian McPhillips, of course. And, and one of the things that Mr. Davis brought up in answer to the question was what happened with Miss acreage seeking other employment within the company on page 11 of our appellate brief. We talk about how she went to LDS, who was the vice president head of marketing and by the way, marketing and underwriting later merged. They were so closely working together and the two anyway, Mr. Davis had given jobs to two other people who were supposedly losing their jobs in underwriting due to underwriting and because of the automation and said he didn't have any other jobs available for anybody else. I refer to Kayla deal and Emily Davenport. So that shoots that down. He turned her down, but he allowed others to come from the what the rearrangement in her office. Now automation is the thing that's been going on in office since 1986, at least and and continuing. It's not a new thing. It's just something they came up with as an excuse. And they had about a hundred jobs that were still available. She had worked in other parts of the going back before automation. I mean, before I'm running, she had been in other departments. She could easily gotten another job there. If they'd offered it to her. Did she apply for any of those jobs? Well, she asked Mr. D's if we're in marketing, which was so close to on writing, if it was a space available for her there, she thought there was. And he said, no, there's not. And she didn't apply for any jobs though. Not beyond that. She took that as a further proof that alpha did not want her. And by the way, you know, when she didn't start her first job there in 1990 and 93, she got MS. At that time, they had different officers that alpha that were very kind and to her and we're glad to have her. But new officer came in as a new president in 2015 or 16, Jimmy, whatever his last name was. And, and then Scott D's was the next officer right under him. Huh? I mean, I mean, she was Scott forest. I'm sorry. It was the next officer right under him after under the president, but he, they were all involved in looking away to eliminate costs. They were very political. They spent a hundred thousand dollars on state Senate candidates, 50 on house of representative candidates in this state. And they could spend that kind of money. They could easily spend a little bit more money to take care of her health costs, but they were looking for ways to cut costs. And so. Can you, can you be very specific about what evidence you have that forest was involved besides the fact that he offered general oversight as the head of HR? Well, he was also the head of Arisa. Okay. And Arisa, if your head of Arisa requires you to closely monitor the cost of your employees, and there was no employee probably costing him more money. I mean, probably nobody close to what she calls them and health. And it was his duty and responsibility to monitor those costs as head of HR. What about the fact that no one, that it appears that no one had accessed that information within the system? Well, that's just not correct. I think there is evidence that, that, that in fact, the documents that have his name all over them had having to do with their termination, just really be speak. What a total falsehood it is for them to say he had nothing to do with it. And then a corporate representative Susie white who testified also said she spent over an hour getting ready for the deposition, talking to Scott Forrest. You see, I mean, Those documents that have Mr. Forrest's name on them. Are they in the record? Yes, sir. Yes, sir. They are very much in the record all over the record. And he passed her every day in the hallway. He knew who she was. And, and, and he knew about her disability. I mean, everybody knew it was well known there. She wasn't on crutches, but when she first came back in 93, she had, it was in a wheelchair. She later got better and was able to get better. But he knew all about the cost of and, and the basis for a termination. It's just to me, it's the most, it's like asking George Washington, if he knows about the American revolution, he says, no, I don't know anything about it. I mean, it's about the same thing. He would have been our number one witness. And, and, and, and, you know, I mean, he would have made our case and it just blows my mind really. In my almost 50 years, I'm 49 and a half years out of law school, I'm practicing law. I've never seen anything remotely like it, especially in discovery. If this, the discovery issue alone is grounds to reverse this case. I mean, the law on discovery requires that there be much more open discovery. And we know the standard for discovery is much broader than what might be admissible at trial, but he was going to be our first witness. And I just never seen anything like it in my life. And, and, you know, so no trying to be respectful to the magistrate judge, by the way, who by agreement, we didn't know at the beginning, when we signed the case to let him do the trial. That's why when we tried to file a petition to 11th circuit on this thing, and we were told there are other opportunities where we could go. I think the 11th circuit may have thought because he was a magistrate, we could go up to the district court judge, but we couldn't. Back at that time, there were only like one or two full-time district judges and they were begging us, the judges to let magistrates try the cases. So we agreed Mr. Davis and I let Mr. Borden grayboard and try the case. And he's a very young brand new sort of magistrate judge. And we thought he would be fair, but we don't think he was, we think he, we went to him eight or 10 times trying to take the deficit. And every time. I think we have your argument, Mr. Phillips. We have your argument. Yes, sir. Thank you. Thank you very much. Thank you counsel. Thank you. Thank you.